No. 05-292

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 215

HAVRE DAILY NEWS, LLC, a Washington Corporation;
THE HAVRE DAILY NEWS, INC., a Montana Subchapter
"S" Corporation; THE ASSOCIATED PRESS; THE
MONTANA NEWSPAPER ASSOCIATION; THE GREAT
FALLS TRIBUNE; THE MONTANA BROADCASTERS'
ASSOCIATION; THE DAILY INTERLAKE; THE
BOZEMAN DAILY CHRONICLE; THE SOCIETY OF
PROFESSIONAL JOURNALISTS, the Montana Pro
Chapter; and THE MISSOULIAN,

        Plaintiffs and Appellants,

      v.

THE CITY OF HAVRE; KEVIN OLSON, in his capacity as
Chief of Police for the City of Havre; MICHAEL BARTHEL,
in his capacity as Assistant Chief of Police for the City of
Havre; LT. GEORGE TATE, in his capacity as a member of
the City of Havre's Police Department,

        Defendants and Respondents.

APPEAL FROM:    The District Court of the Twelfth Judicial District,
                  In and For the County of Hill, Cause No. DV 04-039,
                  Honorable David Rice, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                John M. Shontz and F. Ron Newbury, J.M. Shontz & Assoc.,
                Helena, Montana

        For Respondents:

                Mary VanBuskirk, Bosch, Kuhr, Dugdale, Martin & Kaze, PLLP,
                Havre, Montana

                              Submitted on Briefs: March 8, 2006
                                    Decided:  August 30, 2006

Filed:

                       _____
                                Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     The Havre Daily News and other Montana newspapers (collectively, "the Newspaper") sued the City of Havre, Havre Police Chief Kevin Olson and other members of the Havre Police force (collectively, "Havre"), seeking dissemination of an unredacted initial "incident report" and the accompanying officer's "narrative." The Newspaper also requested the District Court to order Havre to develop and implement a general policy to govern the dissemination of initial offense reports. Because Havre provided the Havre Daily News with the unredacted report, the District Court granted summary judgment in favor of Havre, ruling that the case was moot and non-justiciable, but awarded attorney fees to the Newspaper. The Newspaper now appeals and Havre cross-appeals the award of attorney fees. We affirm in part, reverse in part and remand.

¶2     The following issues are dispositive of this appeal:

¶3     (1) whether the District Court erred in denying the Newspaper's motion for a default judgment;

¶4     (2) whether the District Court erred in granting summary judgment in favor of Havre; and

¶5     (3) whether the District Court erred in determining that the Newspaper may recover attorney fees incurred prior to receiving the unredacted reports.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     The focus of this dispute is a police report describing an officer's investigation that culminated in charges being levied against several individuals for underage drinking.

2

Looking into allegations that the police had shown preferential treatment to an officer's child, Winderl (a reporter for the Havre Daily News) requested to view the initial "incident report" and the accompanying "narrative" prepared by the investigating officer (collectively, "Reports"). The Havre Police Department provided Winderl with both Reports, which he read. Winderl requested a copy of the Reports, and an officer eventually provided him with copies in which the names of two uncharged juvenile witnesses and the parent of one of those juveniles were redacted. Approximately two and a half months later, the Newspaper sued to obtain an unredacted copy of the Reports.

¶7 The Newspaper filed a complaint on March 10, 2004. The complaint detailed the facts surrounding Winderl's receipt of the redacted Reports and requested the court to order Havre to release the unredacted Reports as well as to develop and implement a policy governing future dissemination of such reports ("prospective relief"). More specifically, the Newspaper's request for prospective relief sought the following: (1) implementation of a policy requiring immediate dissemination of complete copies of initial incident reports to the public upon request; (2) a provision that the public pay only the actual cost of reproduction for such copies;[1] and (3) a mandate that particular information (i.e., the name, age, occupation, family status, date of birth and residence of the accused) be included in each initial incident report. Whereas the complaint contained

---

[1]On appeal, the Newspaper has presented no argument pertaining to its request for a policy requiring dissemination of copies at no more than the actual cost of reproduction—not even a simple allegation that a charge of three dollars infringes the constitutional right to know, let alone an articulation of how or why such a charge might violate the constitution. Consequently, we deem this issue waived for purposes of this appeal.

thirty-eight factual allegations, thirty-seven of which pertained only to Winderl's request for the Reports, the Newspaper used this incident as leverage to seek judicial implementation of a broad policy governing all *hypothetical, future* requests for initial incident reports. On March 29, 2004, Havre provided the Havre Daily News with an unredacted copy of the Reports. On April 30, 2004, having never answered the Newspaper's complaint, Havre moved for summary judgment. The Newspaper, in turn, moved for default judgment on the pleadings, pursuant to M. R. Civ. P. 12(c) and 55.

¶8 The District Court granted Havre's request for summary judgment and denied the Newspaper's request for default judgment. The court awarded attorney fees to the Newspaper and ordered the Newspaper to file and serve an affidavit of fees and costs. Counsel for the Newspaper never filed such an affidavit with the court. Instead, the Newspaper filed this appeal.

## STANDARDS OF REVIEW

¶9 "We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct." *Chamberlin v. Puckett Construction*, 277 Mont. 198, 202-03, 921 P.2d 1237, 1240 (1996). Whether a party may avoid default judgment when she fails to answer a complaint and instead files a motion for summary judgment is purely a question of law.

¶10 "We review a District Court's grant of summary judgment *de novo*. . . . We apply the standard declared by Rule 56, M.R.Civ.P. The moving party must establish the absence of a genuine issue of material fact and her entitlement to judgment as a matter of

4

law. We review a district court's conclusions of law to determine whether they are correct." *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 11, 331 Mont. 281, ¶ 11, 130 P.3d 1267, ¶ 11 (citations omitted).

¶11 "Whether or not a party is entitled to recover attorney fees is 'strictly a question of law.' Thus, '[w]e review a district court's conclusions of law pertaining to the recovery of attorney's fees to determine whether those conclusions are correct.'" *Chase v. Bearpaw Ranch Ass'n*, 2006 MT 67, ¶ 14, 331 Mont. 421, ¶ 14, 133 P.3d 190, ¶ 14 (quoting *Transaction Network v. Wellington Tech.*, 2000 MT 223, ¶ 17, 301 Mont. 212, ¶ 17, 7 P.3d 409, ¶ 17 (citation omitted; modification in original)).

## DISCUSSION

*Issue 1: Whether the District Court erred in denying the Newspaper's motion for a default judgment.*

¶12 The Newspaper argues that the District Court should have granted its motion for a default judgment because Havre never answered its complaint, thereby effectively admitting the allegations complained therein. The Newspaper asserts that M. R. Civ. P. 7 limits responsive pleadings to an answer and urges us to reverse *Klock v. Town of Cascade*, 284 Mont. 167, 943 P.2d 1262 (1997), to the extent that it conflicts with Rule 7. Essentially, the Newspaper contends that allowing a party to circumvent the Rules of Civil Procedure—by filing a motion for summary judgment in lieu of an answer—will erode the structure of civil litigation that is built upon these carefully designed rules.

¶13 Havre argues that its motion for summary judgment constitutes a responsive pleading to the complaint; therefore, the court properly denied the Newspaper's motion for default judgment on the pleadings. Havre notes that pursuant to M. R. Civ. P. 55, as interpreted by this Court in *Klock*, a motion for summary judgment is a defense to a complaint. Consequently, Havre contends, a court may not enter default judgment against a party who moves for summary judgment but fails to answer a complaint. We agree.

¶14 M. R. Civ. P. 55(a), requires the clerk to enter default judgment against a defendant who "has failed to plead or otherwise defend as provided by these rules . . . ." In *Klock*, this Court held that a motion for summary judgment satisfies the requirement that a party "otherwise defend" in order to escape default judgment. 284 Mont. at 173, 943 P.2d at 1266. Federal courts construing Rule 55(a) of the Federal Rules of Civil Procedure, which is identical to Montana's rule, have likewise concluded that a defendant may escape default judgment by filing a motion for summary judgment. *See, e.g.*, *Rashidi v. Albright*, 818 F. Supp. 1354, 1355-56 (D. Nev. 1993).

¶15 The Newspaper insists that *Klock* conflicts with M. R. Civ. P. 7, which provides that, aside from various iterations of complaints, answers, and replies, "[n]o other pleading shall be allowed . . . ." Because M. R. Civ. P. 55(a), explicitly contemplates defenses other than pleadings, however, no such conflict exists. A defendant may defend by filing an answer. In addition, a defendant may "otherwise defend," for example by filing a motion for summary judgment or a motion to dismiss pursuant to M. R. Civ. P.

6

12(b). Havre's motion for summary judgment sufficed to prevent the District Court from entering default judgment in favor of the Newspaper.

*Issue 2: Whether the District Court erred in granting summary judgment in favor of Havre.*

**A. Ripeness:**

¶16     The Newspaper argues that the District Court erred in granting summary judgment because its request for prospective relief presents a justiciable issue. The Newspaper asserts that it has an existing constitutional right to receive the information contained in initial arrest and offense reports and that a judgment of the court will protect this right.

¶17     Havre argues that, with respect to the Newspaper's request for prospective relief, no real dispute exists over which the court may exercise judicial authority. Havre maintains that cases arising under the constitutional right to know, Article II, Section 9, of the Montana Constitution, should be determined on a case-by-case basis, and no single rule of decision can apply to all future controversies. Accordingly, Havre contends, adjudication in this case cannot operate as a final judgment prospectively resolving future requests for disclosure of initial offense and arrest reports. We agree that determining which criminal justice information may be disseminated to the public requires a factually specific inquiry that renders prospective adjudication inappropriate.

¶18     The existence of a justiciable controversy is a threshold requirement to a court's adjudication of a dispute, consisting of three elements as identified in *Montana-Dakota Util. Co. v. City of Billings*, 2003 MT 332, ¶ 9, 318 Mont. 407, ¶ 9, 80 P.3d 1247, ¶ 9.

7

Among other reasons, a case may be non-justiciable because it presents an issue that is not ripe for judicial determination. Erwin Chemerinsky, *Federal Jurisdiction*, § 2.1, 44 (4th ed., Aspen 2003). Although the Newspaper and Havre quibble over whether this case presents a justiciable controversy under *Montana-Dakota Util.*, their disagreement is more precisely characterized as an issue of ripeness. Because justiciability encompasses ripeness, the parties have properly raised, albeit imprecisely, the question of whether the Newspaper's request for prospective relief is ripe for review.

¶19 The doctrine of ripeness "requires an actual, present controversy, and therefore a court will not act when the legal issue raised is only hypothetical or the existence of a controversy merely speculative." *Montana Power Co. v. Public Service Comm.*, 2001 MT 102, ¶ 32, 305 Mont. 260, ¶ 32, 26 P.3d 91, ¶ 32. The basic rationale behind the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]" *Montana Power Co.*, ¶ 32; *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S. Ct. 1507, 1515 (1967), *overruled on other grounds Califano v. Sanders*, 430 U.S. 99, 975 S. Ct. 980 (1978); *see also Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588, 92 S. Ct. 1716, 1719 (1972) ("[jurisdiction] should not be exercised unless the case tenders the underlying constitutional issues in clean-cut and concrete form. . . . Problems of prematurity and abstractness may well present insuperable obstacles to the exercise of the Court's jurisdiction") (internal quotations and citations omitted).

¶20 In considering whether a case is ripe for review, federal courts consider the "fitness of the issues for judicial review" and the extent of hardship that will be suffered by the parties if the court withholds review. *Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1247 (3rd Cir. 1996). In conducting the former inquiry, "[t]he principal consideration is whether the record is factually adequate to enable the court to make the necessary legal determinations. The more the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." *Artway*, 81 F.3d at 1249.

¶21 Here, the Newspaper presents a question for adjudication that inherently requires this Court to engage in a fact-intensive inquiry. Each determination regarding the dissemination of criminal justice information requires careful, fact-specific balancing of conflicting constitutional rights. The Montana Constitution imbues the citizenry with a right of privacy, Article II, Section 10, as well as a right to examine documents of "state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure[,]" Article II, Section 9. As this Court has recognized, these rights "inevitably conflict in cases involving a request for confidential criminal justice information . . . ." *Bozeman Daily Chronicle v. Police Dept.*, 260 Mont. 218, 224, 859 P.2d 435, 439 (1993).

¶22 Although the Newspaper confidently asserts that the Reports in this case have been statutorily designated as public criminal justice information, *see* § 44-5-103(13)(e)(i)-(ii), MCA (designating initial offense reports and initial arrest reports as

9

public criminal justice information, but failing to further define either term[2]), their proper classification is not such a simple matter.[3] Ultimately, it matters little whether these Reports are statutorily designated as public criminal justice information, as such legislative classification cannot obviate the inherent tension between the constitutionally protected right of privacy and the constitutionally guaranteed right to know. Notwithstanding its designation as public criminal justice information, an initial offense

[2]After this case was filed, the Department of Justice promulgated administrative rules that define "initial offense report" and delineate the contents thereof. *See* Admin. R. M. 23.12.201 and 23.12.203 (effective August 20, 2004). In light of the fact that these rules have been promulgated, the Newspaper's request for judicial re-determination of the required contents of initial incident reports amounts to a request that this Court usurp the rule-making authority of the Department of Justice, *see*, § 44-5-105, MCA, and effectively declare Admin. R. M. 23.12.203 unconstitutional.

[3]The Reports are actually labeled as an "Incident Report" and an accompanying "Narrative for Sergeant Paul S. Huston." Assuming that these are properly treated as initial arrest reports, initial incident reports, or one of each, definitional ambiguity persists. Such ambiguity stems from the legislative classification of "criminal investigative information" as confidential criminal justice information, § 44-5-103(3)(a), MCA. "Criminal investigative information," in turn, is defined as "information associated with an individual . . . or event compiled by a criminal justice agency in the course of conducting an investigation of a crime or crimes. It includes information about a crime or crimes derived from reports of informants or investigators or from any type of surveillance." Section 44-5-103(6)(a), MCA.

Sergeant Huston's "Narrative" describes his investigation of a report of an underage drinking party. The "Narrative" details his initial surveillance of the area, his apprehension of a fleeing suspect, his procurement of physical evidence of the party (empty, partially full, and unopened beer cans), and his initial interviews of suspects and uncharged witnesses. In so far as the "Narrative" contains information gathered by Sergeant Huston "in the course of conducting an investigation" into the reported crimes (including interviews with witnesses) and his preliminary surveillance of the scene, it constitutes "criminal investigative information," § 44-5-103(6)(a), MCA, and therefore qualifies as "confidential criminal justice information," § 44-5-103(3)(a), MCA. Assuming, as does the Newspaper (sans explanation), that this "Narrative" also qualifies as an initial offense (or arrest) report, the legislature has paradoxically classified it as both public criminal justice information and confidential criminal justice information.

10

report will sometimes contain discrete pieces of information that qualify as confidential criminal justice information, or information in which an individual, with notice of possible disclosure, has voiced her subjective expectation of privacy and for which the demands of individual privacy vastly outweigh the merits of public disclosure. Victims of child abuse or "sex crimes, for example, may have a legitimate expectation of privacy[,]" *In Re Lacy*, 239 Mont. 321, 324, 780 P.2d 186, 188 (1989), that would preclude publicly disseminating their names and, depending on the circumstances, the location of the crime or other identifying information. Indeed, this Court has recognized that suspects, particularly during the early phase of an investigation (precisely the phase that will be referenced in an initial offense report) may have a cognizable expectation of privacy. *In Re Lacy*, 239 Mont. at 324, 780 P.2d at 188. As a final example, witnesses to a gang killing—whose safety may be jeopardized by public circulation of their names or addresses—may have a privacy interest in such information that clearly outweighs the merits of public disclosure.

¶23    In each of these hypothetical cases, in order to balance the constitutional right to know against the conflicting constitutional right of individual privacy, a reviewing court[4] would first ascertain whether the individual has an actual expectation of privacy. *Bozeman Daily Chronicle*, 260 Mont. at 225, 859 P.2d at 439. This, of course, is purely a question of fact, which entails determining whether the individual whose privacy interest

---

[4]Of course, long before a dispute reaches the courts, somebody (or perhaps a committee) within the government agency would have already made each of these three determinations before deciding to withhold information in order to protect the right of privacy.

is at issue has notice of possible disclosure. The court would then ascertain whether society recognizes this expectation as reasonable. *Bozeman Daily Chronicle*, 260 Mont. at 225, 859 P.2d at 439. This determination of law necessarily involves reasoned consideration of the specific facts underlying the dispute. To provide but a few examples, the following inquiries may prove relevant in evaluating the reasonableness of an individual's expectation of privacy: (1) attributes of the individual, including whether the individual is a victim, witness, or accused and whether the individual holds a position of public trust, *Jefferson County v. Montana Standard*, 2003 MT 304, ¶ 17, 318 Mont. 173, ¶ 17, 79 P.3d 805, ¶ 17; *Bozeman Daily Chronicle*, 260 Mont. at 227, 228, 859 P.2d at 441; *Svaldi v. Anaconda-Deer Lodge County*, 2005 MT 17, ¶ 31, 325 Mont. 365, ¶ 31, 106 P.3d 548, ¶ 31; (2) the particular characteristics of the discrete piece of information, *Jefferson County*, ¶ 20 (holding that an individual has a protected privacy interest in her social security number and driver's license number); *Bozeman Daily Chronicle*, 260 Mont. at 228-30, 859 P.2d at 441-42 (holding that the names of witnesses and the victim of a sexual assault cannot be disseminated and concluding that "[an *in camera*] review of [investigative reports] is, however, essential in determining whether or not the privacy interests of the victim and witnesses can be protected while disseminating the remainder of the information[,]" and further recognizing that a protective order may be necessary to properly protect those privacy interests); and (3) the relationship of that information to the public duties of the individual, *Jefferson County*, ¶¶ 17, 20; *Bozeman Daily Chronicle*, 260 Mont. at 226-27, 859 P.2d at 440-41. The important point is that among

the vast spectrum of information, innumerable facts—placed within the particular context of a specific dispute—may bear on the assessment of reasonableness in hypothetical future disputes. Finally, the court would weigh the demands of individual privacy against the merits of public disclosure. *Bozeman Daily Chronicle*, 260 Mont. at 227, 859 P.2d at 441. Such balancing demands that the court determine the merits of publicly disclosing the discrete pieces of information at issue, which again involves a fact-specific inquiry, taking consideration of the particular context from which such disclosure will proceed. *See, e.g.*, *Engrav v. Cragun*, 236 Mont. 260, 267, 769 P.2d 1224, 1229 (1989) (considering the purpose for which public criminal justice information is sought before determining that the names included on initial arrest reports need not be disseminated).

¶24 Prospective relief is inappropriate because each of these three determinations necessarily involves a factually specific inquiry, which "requires this Court to balance the competing constitutional interests in the context of the facts of each case," *Missoulian v. Board of Regents of Higher Educ.*, 207 Mont. 513, 529, 675 P.2d 962, 971 (1984). Accordingly, "in the absence of a concrete fact situation in which the competing [constitutional right to know and right to privacy] can be weighed," this Court simply cannot "determine whether an effort to compel disclosure of [criminal justice information] would or would not be barred," *California Bankers Ass'n v. Schultz*, 416 U.S. 21, 56, 94 S. Ct. 1494, 1515 (1974).

¶25 The dissent recasts the Newspaper's claim as a request that Havre implement systematic procedures to govern dissemination of initial incident reports and

13

characterizes that claim as a request for relief "from a real, presently existing, and readily identifiable problem which implicates the public's right to know—i.e., the Police Department's lack of procedures governing its decisions to withhold information contained in initial incident reports." ¶ 51. In the course of this creative endeavor, the dissent overlooks a determinative fact,[5] which renders even this strained reformation of the Newspaper's complaint unripe: that is, the Newspaper's claim does not allege any discernible violation of the law that might form the basis of a justiciable controversy. Montana's Constitution provides that "[n]o person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure." Mont. Const. art. II, § 9. The dissent acknowledges that even in the face of a policy, government agencies will need to make discrete ad hoc determinations in order to adequately protect privacy rights. In the absence of a case specific determination, there can be no violation of the clear command of Article II, Section 9 of Montana's Constitution. Not until a person has been denied access to a document has that person been deprived of her "right to examine" any document. The mere absence of a policy governing dissemination of documents does not ripen into a violation of the constitutional right to know unless and until an identifiable

---

[5]In addition, the dissent overlooks the fact that, according to the sole factual allegation in the Newspaper's complaint that does not deal exclusively with the Reports, Havre apparently does have a policy for handling requests for dissemination of such reports: such requests are not, as the dissent suggests, denied, but are referred to Officer Bartel. The Newspaper simply disapproves of this informal policy, and so has asked the courts to rewrite it, under the auspices of the Constitution.

14

person is actually denied access to a particular document or a specific deliberation. The dissent would enable well-funded litigants who simply disagree with the policies governing dissemination of a government agency's documents to drag the agency into court, and to challenge the perceived constitutional flaws of such a policy, wholly divorced from any factually based, concrete violation of the constitutional right to know. Operating in this manner would have one decided advantage: This Court could simply dispense with the practice of reviewing the often cumbersome factual records that provide the basis for our applications of the law and, like the dissent, turn to facts that are not of record in a case, picking and choosing those which are most convenient to the desired outcome of the academic dispute at hand. Nevertheless, this Court may not rely on facts outside of the record in resolving an issue before it. *Huffine v. Boylan*, 239 Mont. 515, 517, 782 P.2d 77, 78 (1989).

¶26 The dissent relies heavily on *Great Falls Trib. v. Mont. Pub. Ser. Com.*, 2003 MT 359, 319 Mont. 38, 82 P.3d 876, wherein this Court articulated a presumption of openness and the "'affirmative' duty [of] government officials to make all of their records and proceedings available to public scrutiny." ¶ 54. In stark contrast to most cases relating to dissemination of criminal justice information, *Great Falls Trib.* only involved the rights of corporate entities, rather than the rights of private individuals. ¶ 39, ¶ 56. Thus the right of privacy was not at issue. *See Great Falls Trib.*, ¶ 39 ("non-human entities do not enjoy privacy rights under the right of privacy provision of the Montana Constitution"). Accordingly, this Court's articulation of a presumption of

15

openness and "affirmative duty" of disclosure cannot be read to nullify the need, in the first instance, to balance the right to know against the conflicting right of individual privacy on an ad hoc basis when both rights are at issue. Given the "inevitable conflict" that arises with requests for confidential criminal justice information, *Bozeman Daily Chronicle*, 260 Mont. at 224, 859 P.2d at 439, a requirement that governmental agencies provide unredacted copies on demand is untenable. Given society's concern over the erosion of individual privacy, it would eviscerate the constitutional right of privacy to require agencies to disclose unredacted documents on demand, leaving the media, unbound by any constitutional mandate or judicial scrutiny, to unilaterally make decisions concerning Montanans' privacy rights.

¶27 The Newspaper's request for prospective relief lacks *any* concrete factual basis[6] and represents a request for relief from a purely hypothetical future violation of its right to know. Accordingly, the Newspaper's request for prospective relief presents an unripe and, therefore, non-justiciable, controversy.

---

[6]We deem the Newspaper's claims pertaining to Winderl's request for the Reports moot, *see* below ¶¶ 28-40. Consequently, the Newspaper's request for prospective relief, distilled to its essence, constitutes a challenge to the constitutionality of § 44-5-105, MCA (granting the Department of Justice rulemaking authority with respect to criminal justice information), as well as a challenge to the constitutionality of a rule promulgated thereunder, specifically Admin. R. M. 23.12.203. The Newspaper may mount such a direct challenge in another proceeding, pursuant to § 2-4-702, MCA. Disconnected from any factual basis, however, the Newspaper's present attempt to collaterally challenge the rule fails for want of ripeness both for the reasons enumerated above and due to the absence of any administrative record that might provide a court with some factual bases to guide the effort to balance the conflicting constitutional rights at issue.

**B. Mootness:**

¶28 The Newspaper's request for prospective relief fails for want of ripeness. The question remains, however, whether the District Court properly granted summary judgment with respect to the Newspaper's claim that Havre illegally denied access to the unredacted Reports.

¶29 The Newspaper argues that the Havre Daily News's receipt of the complete Reports concerning the underage drinking charges did not render this case moot. The Newspaper contends that this case falls within the exception to mootness for wrongs that are "capable of repetition, yet evading review," *Common Cause v. Statutory Committee*, 263 Mont. 324, 328, 868 P.2d 604, 607 (1994) (quotations omitted), and that they have presented a constitutional issue that involves the "broad public concerns to avoid future litigation on a point of law," *Walker v. State*, 2003 MT 134, ¶ 41, 316 Mont. 103, ¶ 41, 68 P.3d 872, ¶ 41 (quotations omitted). While apparently conceding that Havre could not repeat the identical behavior complained of, the Newspaper suggests that it will encounter similar obstructions in the future.

¶30 Havre argues that this case is moot because the Havre Daily News has already received the very Reports that the Newspaper seeks to obtain through this litigation. Havre suggests that the courts cannot provide relief with respect to Reports that the Newspaper has already procured. Havre maintains that it cannot repeat the alleged wrong, because it has already provided the Havre Daily News with the Reports at issue. Thus, no actual controversy remains; instead, only a hypothetical future controversy

17

remains, which is not the "same action" contemplated by the above-mentioned exception to the mootness doctrine. We agree with Havre that the issue pertaining to the release of the Reports was mooted by the Havre Daily News's receipt of the unredacted Reports.

¶31 Mootness is a threshold issue which we must resolve before addressing the substantive merits of a dispute. *Grabow v. Montana High School Ass'n*, 2000 MT 159, ¶ 14, 300 Mont. 227, ¶ 14, 3 P.3d 650, ¶ 14. "A matter is moot when, due to an event or happening, the issue has ceased to exist and no longer presents an actual controversy. . . . A question is moot when the court cannot grant effective relief." *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶ 19, 293 Mont. 188, ¶ 19, 974 P.2d 1150, ¶ 19 (citations omitted). Commentators have described mootness as the "doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Henry Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973). Thus, a justiciable controversy in which the parties have a personal stake must exist at the beginning of the litigation, and at every point thereafter, unless an exception to the doctrine of mootness applies.

¶32 "This Court reserves to itself the power to examine constitutional issues that involve the broad public concerns to avoid future litigation on a point of law." *Walker*, ¶ 41 (quotations omitted). In light of the foregoing ripeness analysis, future litigation on the scope of the constitutional right to know and its interaction with the constitutional right to privacy will not be avoided by issuing the prospective relief that the Newspaper

18

has requested, nor by addressing the legality of Havre's redaction of a portion of the since-revealed Reports. Thus, the Newspaper may not invoke this broad, mal-defined principle to resuscitate an otherwise moot controversy.

¶33 Federal courts have developed similar but distinct exceptions to mootness for wrongs "capable of repetition, yet evading review," and "voluntary cessation" of a wrong. *See, e.g.*, *Iowa Protection and Advocacy Services v. Tanager, Inc.*, 427 F.3d 541, 543-44 (8th Cir. 2005). As its implementation by the federal courts makes clear, the exception to mootness for wrongs "capable of repetition, yet evading review" is properly confined to situations where the challenged conduct *invariably* ceases before courts can fully adjudicate the matter. *See, e.g.*, *Spencer v. Kemna*, 523 U.S. 1, 18, 118 S. Ct. 978, 988 (1998) (declining to apply the exception because "[petitioner] has not shown . . . that the time between [the challenged wrong] and [the occurrence rendering the case moot] is *always* so short as to evade review") (emphasis added); *see also*, *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705 (1973) (nine-month term of pregnancy effectively precludes full appellate review of restrictions on abortion prior to the completion of any individual plaintiff's pregnancy); *Southern Pac. Terminal v. Interstate Commerce Commission*, 219 U.S. 498, 514-15, 31 S. Ct. 279, 283 (1911) (short duration of Interstate Commerce Commission orders precludes appellate review prior to the orders' expiration); *Nebraska Press v. Stuart*, 427 U.S. 539, 546, 96 S. Ct. 2791, 2797 (1976) (prior restraint on speech via a pre-trial gag order evades review because of its inherently short duration); *Dunn v. Blumstein*, 405 U.S. 330, 333 n. 2, 92 S. Ct. 995, 998 n. 2 (1971) (one-year residency

19

requirement for voter registration will evade review because by the time an individual's challenge reaches the Supreme Court, invariably that individual has satisfied the residency requirement).

¶34 When, as here, a defendant's challenged conduct is of indefinite duration, but is voluntarily terminated by the defendant prior to completion of appellate review, federal courts apply the "voluntary cessation" exception to mootness. *See, e.g.*, *Jews for Jesus, Inc. v. Hillsborough County Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998) ("voluntary cessation of a challenged practice renders a case moot only if there is no 'reasonable expectation' that the challenged practice will resume after the lawsuit is dismissed"). Although the exception for "voluntary cessation" of the challenged conduct is quite similar to the exception for wrongs "capable of repetition, yet evading review," an important distinction separates the two. Due to concern that a defendant may utilize voluntary cessation to manipulate the litigation process,[7] "[t]he 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 708 (2000) (second modification in the original). In contrast, under the exception to mootness for wrongs "capable of repetition, yet evading review," the party invoking the exception—generally

_____

[7]The concern is that a defendant will attempt to moot only a plaintiff's meritorious claims, thereby avoiding an undesirable judgment on the merits while vigorously contesting those cases in which he expects to prevail. *See U.S. v. W.T. Grant*, 345 U.S. 629, 632-33, 73 S. Ct. 894, 897 (1953). This concern is particularly acute in situations when one would expect the same defendant to encounter substantially identical future controversies.

the plaintiff—bears the burden of showing that the challenged conduct inherently is of limited duration, so as to evade review, and that "there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Spencer*, 523 U.S. at 17-18, 118 S. Ct. at 988 (modifications in original); *see also Skinner v. Lewis and Clark*, 1999 MT 106, ¶ 18, 294 Mont. 310, ¶ 18, 980 P.2d 1049, ¶ 18 (imposing the burden on the party invoking the exception to mootness). We appreciate the importance of properly assigning this burden. Accordingly, we hereby adopt the federal exception to mootness for a party's "voluntary cessation" of a challenged practice.

¶35 Relying on existing Montana law, both parties contest whether the current case falls under the exception for "wrongs capable of repetition, yet evading review." *Common Cause*, 263 Mont. at 328, 868 P.2d at 607. This Court first adopted this exception to our mootness doctrine from federal jurisprudence. *See Matter of N.B.*, 190 Mont. 319, 323, 620 P.2d 1228, 1231 (1980) (relying on *Roe v. Wade* to support our adoption of the exception to mootness for wrongs that "could be capable of repetition, yet could evade review").

¶36 Generally, like the federal courts, this Court has limited application of this exception to situations where the challenged conduct is of inherently limited duration. *See, e.g.*, *Grabow*, ¶ 15 ("[t]his exception recognizes that the amount of time inherent in the litigation process renders it *nearly impossible* in some cases for a final judicial decision to be reached before the case is rendered moot") (emphasis added); *see also*, *Common Cause*, 263 Mont. at 327-28, 868 P.2d at 606-07 (concluding that the

21

legislature's confirmation of a recommended appointee five months after initial recommendation does not moot a challenge to the recommendation process); *Matter of N.B.* (holding that the expiration of a ninety-day involuntary commitment does not moot a challenge to the commitment order). On at least two previous occasions, however, this Court has applied the exception for wrongs "capable of repetition, yet evading review" to conduct that is of indefinite duration. *See Heisler v. Hines Motor Co.*, 282 Mont. 270, 937 P.2d 45 (1997) (concerning the legality of defendant's initial refusal to pay medical expenses, for which defendant subsequently provided payment); *see also Montana-Dakota Util.* (concerning the legality of a city ordinance that voters later overturned by ballot initiative). In both of these cases, we effectively conflated the exception for wrongs "capable of repetition, yet evading review," with the exception for "voluntary cessation" of the challenged conduct. Our lack of precision, however, did not affect the ultimate outcome of these cases.[8] We now clarify that in *Heisler* and *Montana-Dakota Util.*, this Court should have applied the exception to mootness for "voluntary cessation" of the challenged practice.

¶37 Here, the Newspaper challenged Havre's obstruction of access to certain information within the Reports. The duration of such obstruction is not inherently limited. Rather, it will inevitably persist until such time as Havre voluntarily, or under

---

[8]In both *Heisler* and *Montana-Dakota Util.*, we found that the cases were not moot because the plaintiffs had demonstrated a "reasonable expectation that [they] would be subject to the same action again." *Montana-Dakota Util.*, ¶ 7; *Heisler*, 282 Mont. at 276, 937 P.2d at 48. Thus, the defendants could not possibly have established that the challenged conduct could not reasonably be expected to recur, as necessary to render the case moot under the "voluntary cessation" exception.

court order, reveals this information. Accordingly, this case is not amenable to consideration under the exception to mootness for wrongs "capable of repetition, yet evading review," notwithstanding the Newspaper's argument that this case falls under that exception. Nevertheless, because this Court has previously conflated these distinct exceptions to mootness, and because Havre voluntarily divulged the complete Reports before this or any court could review the legality of its having redacted portions of the Reports, we will consider whether this case comes under the exception for "voluntary cessation" of the challenged practice.

¶38 Under the "voluntary cessation" exception, a case may be mooted by the defendant's voluntary conduct only when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189, 120 S. Ct. at 708. In the context of cases alleging an unconstitutional deprivation of access to (purportedly confidential) criminal justice information, when a plaintiff points to only a single instance of an agency's withholding a document and later disclosing the same after suit has been filed, the case will generally not fall within the "voluntary cessation" exception to mootness. In such a case, it is not generally reasonable to expect the "same wrong"[9] to recur, such that a ruling on the merits would be of any discernible

---

[9]The same wrong, at a high level of abstraction (i.e., deprivation of access to documents containing criminal justice information that should be publicly disseminated, notwithstanding the right of privacy), will predictably recur. As illustrated above, *see* ¶¶ 21-23, however, in determining whether the criminal justice agency has perpetrated a "wrong," we engage in a fact-specific three-part balancing test. Viewed through this lens, improper deprivations of access to criminal justice documents are not at all interchangeable. Rather, the unique facts of each case dictate the ultimate outcome,

23

future benefit to the litigants or the interests of judicial economy. Exceptions to the mootness doctrine allow courts to rule on non-extant controversies in order to provide guidance concerning the legality of expected future conduct. Yet, in light of the literally infinite assemblage of variables that could arise in a future dispute (and prove determinative of its outcome), final judicial disposition of the tripartite test for balancing the competing constitutional interests will provide limited meaningful guidance, if any, to the conduct of hypothetical future parties.

¶39　If however, a plaintiff could show that the same agency has repeatedly withheld documents (or information contained within documents) from public disclosure and then fully disclosed those same documents upon the plaintiff's filing suit to enforce its right to know, the agency would shoulder a very hefty burden in attempting to persuade this Court that the "challenged conduct cannot reasonably be expected to [recur]." *Laidlaw*, 528 U.S. at 189, 120 S. Ct. at 708. In such a situation, the agency's conduct violates at least one constitutional right and becomes transparently manipulative, or perhaps merely evinces apparent genuine confusion over the legality of public dissemination in certain contexts. Thus, it becomes reasonable to expect that if a substantially similar situation occurs, the agency will repeat the obstructive tactics that the plaintiff challenges,

---

resulting in distinctive dispositions. The resolution of a dispute will generally provide only limited guidance in resolving a narrow class of potential future disputes. Accordingly, in this context, in considering whether the "same wrong" will recur, courts should conceive of the wrong in concrete terms, rather than in the abstract. Thus, whether a deprivation constitutes the "same wrong" depends on whether the substantially identical constellation of facts—facts which breathe life into and shape the conflicting constitutional rights—will recur.

perpetrating a substantially similar, though not identical, wrong. In such cases, final judicial adjudication may provide useful guidance that may obviate future violations of the right to know. Accordingly, a plaintiff may likely obtain adjudication of such past disputes under the "voluntary cessation" exception to mootness.

¶40 Havre has provided the Havre Daily News with a complete copy of both Reports. The Newspaper alleges no other past instances of the Havre Police Department's unconstitutionally depriving it of access to documents or portions thereof. Nor does it point to inevitable future violations of the right to know in anything other than conjectural, conclusory fashion. Thus, the identical wrong is incapable of recurrence, and the Newspaper points to no concrete evidence suggesting that Havre will perpetrate a substantially similar wrong. Consequently, Havre has conclusively established that "the challenged conduct"—redacting portions of these particular Reports—"cannot reasonably be expected to [resume]."[10] *Laidlaw*, 528 U.S. at 189, 120 S. Ct. at 708. Any hypothetical refusal to provide access to such reports in the future would not constitute a recurrence of the same challenged conduct because we must "balance the competing constitutional interests" at issue under the unique "facts of each case," *Missoulian*, 207 Mont. at 529, 675 P.2d at 971. To the extent that this case once presented a justiciable controversy, that dispute has been rendered moot by Havre's providing the Havre Daily News with a complete copy of the Reports.

---

[10]The outcome here would not differ if we were to apply the exception for wrongs "capable of repetition, yet evading review," because the Newspaper cannot establish a reasonable expectation that it will be subjected to the same action again.

¶41     Rather than granting summary judgment in favor of Havre, thereby indicating that Havre is entitled to prevail on the merits as a matter of law, the District Court should have dismissed this unripe, moot, and therefore non-justiciable controversy without prejudice. *See Parker v. Weed*, 220 Mont. 49, 51, 713 P.2d 535, 537 (1986) (reversing a district court's award of summary judgment to a defendant, and indicating that the court properly disposes of a non-justiciable controversy by dismissing the case without prejudice). Consequently, this case is remanded to the District Court with instructions to dismiss the Newspaper's claims without prejudice.

***Issue 3: Whether the District Court erred in determining that the Newspaper may recover attorney fees incurred prior to receiving the unredacted Reports.***

¶42     The Newspaper contests the District Court's award of attorney fees. The Newspaper contends that it brought this action to enforce its constitutional right to know, so the court should have awarded the Newspaper all fees incurred in this action, including fees incurred on appeal. The Newspaper insists that its failure to file an affidavit on attorney fees is of no consequence. Instead of filing an affidavit based on the District Court's limited award of fees, the Newspaper appealed the award and requested a broader award of attorney fees. Presumably, the Newspaper expects that once this Court has resolved the dispute over its entitlement to fees, it can then introduce evidence as to the appropriate amount of attorney fees.

¶43     Havre contests both the Newspaper's entitlement to attorney fees as a matter of law and the lack of any evidentiary basis for awarding a specific amount of fees. Havre

26

argues that the Newspaper did not prevail in the District Court, so it cannot recover attorney fees pursuant to § 2-3-221, MCA. Havre contends that the Newspaper did not bring this action to enforce its constitutional right to know, because Winderl had already viewed a complete copy of the Reports before receiving the redacted versions. Havre suggests that the public has not benefited from the Newspaper's efforts, so no justification exists for spreading litigation costs to the taxpayers. Finally, Havre maintains that by failing to file either a court ordered fee affidavit before filing an appeal or a motion under M. R. Civ. P. 59(g) to alter or amend the judgment within ten days of receiving notice of entry of judgment, the Newspaper effectively waived its right to recover attorney fees.

¶44 Section 2-3-221, MCA, provides that "[a] plaintiff who prevails in an action brought in district court to enforce his rights under Article II, section 9, of the Montana constitution may be awarded his costs and reasonable attorneys' fees." A district court exercises discretion in awarding fees under this section. *Bozeman Daily Chronicle*, 260 Mont. at 230, 859 P.2d at 442. Although Havre correctly observes that the Newspaper did not technically "prevail" in its action in the District Court, the court granted summary judgment in favor of Havre precisely because Havre mooted the case by providing the Newspaper with unredacted copies of the Reports. Absent Havre's conduct, the case would not have become moot. In mooting the case, Havre provided the Newspaper with the very relief it sought to procure through litigation; thus, the Newspaper has prevailed in substance, albeit without court intervention. Given these circumstances, we will

27

consider the Newspaper to be the prevailing party with respect to its request for unredacted copies of the Reports. Otherwise, a similarly situated party could, after extensive litigation, at the eleventh hour, and facing imminent defeat, simply moot a case in order to dodge this fee-shifting statute. Because its unripe request for prospective relief was never justiciable, the Newspaper is not the prevailing party with respect to those claims.

¶45 Havre speciously argues (based on Winderl's momentary viewing of the unedited Reports) that the Newspaper did not bring this cause of action to enforce its constitutional right to know, and that the public derived no benefit from the Havre Daily News's obtaining unredacted copies of the Reports. By its terms, the right to know is not constrained by time nor by whether a person has already once examined a document. *See* Mont. Const. art. II, § 9. Deprivation of access to a document is no less a violation of the right to know simply because temporary access was once granted. A government does not achieve transparency and accountability—the ostensible purposes behind the constitutional right to know—by allowing citizens only a fleeting glance at documents. Faced with the prospect of lawsuits for libel and slander, the media cannot effectively hold the government publicly accountable if afforded the opportunity to view but temporarily the evidence on which its stories rely, but denied the opportunity to actually procure and preserve that same evidence.

¶46 Finally, Havre's argument that the Newspaper waived its right to recover attorney fees by failing to provide the court with evidence of the proper amount of fees also lacks

merit. The District Court ordered the Newspaper's counsel to file an affidavit of attorney fees. The court imposed no deadline for counsel's filing this affidavit. We have repeatedly affirmed a party's legal entitlement to recover attorney fees and remanded for a proper evidentiary determination of the recoverable amount of attorney fees. *See, e.g.*, *Plath v. Schonrock*, 2003 MT 21, ¶ 41, 314 Mont. 101, ¶ 41, 64 P.3d 984, ¶ 41. Thus, the failure to file an affidavit of attorney fees prior to pursuing this appeal is not fatal to the Newspaper's entitlement to recover fees. Furthermore, Havre incorrectly suggests that the Newspaper's failure to file a motion to alter the verdict pursuant to M. R. Civ. P. 59(g) undermines its right to recover fees. The District Court's determination that the Newspaper is legally entitled to recover fees renders M. R. Civ. P. 59(g) irrelevant. *See Chase v. Bearpaw Ranch Ass'n*, 2006 MT 67, ¶¶ 18-23, 331 Mont. 421, ¶¶ 18-23, 133 P.3d 190, ¶¶ 18-23 (holding that a court has rendered its decision on a Rule 59(g) motion for attorney fees when it awards fees, albeit without specifying an amount).

¶47    Judicial economy would be promoted if the Newspaper had procured a definite fee award before appealing. The Newspaper, however, used this appeal in order to assert its broad legal entitlement to attorney fees. On this legal question, which is ripe for review, we largely concur with the District Court's determination. Havre cross-appealed, asserting that the Newspaper waived its right to recover the fees actually awarded by the court. Because the court has not yet awarded fees in any specific amount, Havre has essentially asked us to review an action that the District Court has not yet taken. Thus, Havre's cross-appeal is not ripe for review. *See Langemo v. Montana Rail Link, Inc.*,

29

2001 MT 273, ¶ 34, 307 Mont. 293, ¶ 34, 38 P.3d 782, ¶ 34 (holding that an issue is not ripe for review absent a conclusive ruling by the district court).

¶48     The District Court properly determined that the Newspaper may recover those attorney fees incurred in securing the unredacted Reports.  Any attorney fees incurred after that time are not recoverable.  We affirm and remand for the District Court to hold an evidentiary hearing to ascertain the amount of legal fees incurred by the Newspaper *in order to obtain the unredacted Reports* prior to its receipt of those Reports.  Any fees incurred prior to that time *in an attempt to obtain prospective relief* may not be recovered by the Newspaper.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice James C. Nelson concurs and dissents.

¶49 I concur in the Court's resolution of Issue One. I dissent with regard to Issue Two. As for Issue Three, I agree that the Newspaper is entitled to recover attorney fees incurred in securing the unredacted reports. However, given my conclusion as to Issue Two, I would remand for consideration of an award of additional attorney fees, pursuant to § 2-3-221, MCA, following proper resolution of the Newspaper's remaining claim.

¶50 As for Issue two, I do not agree with the Court's conclusion that this claim is not ripe for adjudication. In my view, the Court's analysis is based on a flawed premise. Given its ongoing interest in obtaining initial incident reports to determine whether they contain newsworthy information, the Newspaper sought a remedy to the Police Department's failure to follow systematic procedures in accommodating the public's right to know. The Court characterizes this claim as a "request for prospective relief" and, on that basis, proceeds to conclude that the claim is not ripe for adjudication. I disagree with this characterization.

¶51 I conclude that the Newspaper's claim is a request for instant relief. The Court states that the Newspaper's request for "prospective relief" amounts to "a request for relief from a purely hypothetical future violation of its right to know." This statement is wholly inaccurate. The Newspaper seeks relief not from a "purely hypothetical future violation," but from a real, presently existing, and readily identifiable problem which implicates the public's right to know—i.e., the Police Department's lack of procedures governing its decisions to withhold information contained in initial incident reports.

31

Addressing this claim plainly does not require "prospective adjudication" or an evaluation of specific factual scenarios which are not presently before us, as the Court asserts. The Court further mischaracterizes the claim at issue here by suggesting that the Newspaper asks us to balance the public's right to know against an individual privacy interest in a hypothetical future case.

¶52 Because the implementation of a policy would likely preclude or resolve some future conflicts, the Newspaper's claim may, *in part*, be properly characterized as a request for prospective relief. However, it is plainly wrong to characterize the *entire* claim in this manner. The problem identified is one that exists presently, and the relief sought would immediately change the way the Police Department handles this kind of request. Thus, the Court's blanket characterization ignores the immediate nature of both the problem identified by the Newspaper and the relief requested.

¶53 Moreover, the Court misconceives the nature of this appeal in stating at the outset that the "focus of this dispute is a police report." Similarly, the Court also states that "the challenged" conduct in this case is "redacting portions of these particular Reports." Access to the redacted information was an issue in the proceedings below when the Newspaper sought to obtain the full Reports. However, Havre has since disclosed the full text of the Reports, albeit belatedly. Accordingly, the Newspaper's claim for the release of the unredacted Reports is moot.

¶54 Neither party disputes the fact that the Newspaper's claim of entitlement to the unredacted Reports is moot. Nonetheless, this Court devotes nearly ten pages of

mootness analysis to "the Newspaper's claim that Havre illegally denied access to the unredacted Reports." And for what? To simply conclude that the Newspaper's claim for "the release of the Reports was mooted by the Havre Daily News's receipt of the unredacted Reports." This analysis is wholly unnecessary given that neither party contests this issue or presents it for our review. Thus, the majority here renders an advisory opinion—something which we have unequivocally stated that we will not do. *Ingraham v. State* (1997), 284 Mont. 481, 487, 945 P.2d 19, 23 (citing *State ex rel. Fletcher v. District Court* (1993), 260 Mont. 410, 419, 859 P.2d 992, 997).

¶55 The particular documents which the Newspaper sought are simply not an issue here, much less the "focus" of this dispute. The real issue on appeal is whether the District Court properly granted summary judgment on the Newspaper's remaining claim.

¶56 The Newspaper's Complaint contains two distinct claims. Besides seeking the unredacted Reports, the Newspaper recognized a larger problem at the outset of this case—the state of affairs in which the public is forced to file suit in order to exercise its constitutional right to know. Upon this recognition, and given its ongoing interest in obtaining initial incident reports to determine whether they contain newsworthy information, the Newspaper sought a remedy to the Police Department's failure to follow systematic procedures in determining whether to withhold incident reports from the public.

¶57 Specifically, the Complaint contained, *inter alia*, the following allegations: (1) that Lt. George Tate initially allowed Winderl to view an unredacted

copy of the Reports; (2) that Lt. Tate then vacillated, signaling that he was reluctant to release the entirety of the documents to Winderl because it included the names of individuals who were not charged; (3) that Winderl contacted Lt. Tate later that day, at which time Lt. Tate said he was "uncomfortable" providing a copy of the Reports without discussing the issue with his superior officers; (4) that Winderl was eventually provided with a copy of the Reports, with certain material redacted, including all references to Police Chief Kevin Olson and his daughter; and (5) that Winderl had, in the past, sought to access incident reports by asking low ranking officers, receptionists, and dispatchers at the Police Department, that these individuals would not provide access to the reports, and that they had referred Winderl to a high ranking officer. The Complaint also alleged that the Police Department charged Winderl three dollars to obtain the redacted copy, and that this charge exceeded the cost of creating the copy.

¶58 As a legal basis for the Complaint, the Newspaper asserted, *inter alia*, that the Montana Constitution requires that public documents be made available at a cost adequate to cover only the expense of making the copy, and that Montana law requires government agencies to implement policies and procedures which guarantee the public's exercise of its right to know.

¶59 Upon these allegations, the Newspaper sought implementation of a policy requiring: (1) that the Police Department "provide complete copies of all initial incident reports to the public during regular business hours upon demand by the public"; (2) that initial incident reports include a number of specific items, including personal information

34

regarding the accused and any witnesses; and (3) that the Police Department provide copies of initial incident reports and attachments "at a cost not to exceed the actual cost of reproducing the copy regardless of the form the report or attachments are in."[1]

¶60 The Court considers the Newspaper's pleadings an "untenable" request that "governmental agencies provide unredacted copies on demand." I disagree. All pleadings must be construed so as to do substantial justice. Rule 8(f), M.R.Civ.P. In assessing complaints, we "'look to the claim as a whole, to the subject with which it deals, to the reason and spirit of the allegations in ascertaining its real purpose. If such purpose can reasonably be said to be within the scope of the language used, that purpose should be honored.'" *School Trust v. State ex rel. Bd. of Comm'rs*, 1999 MT 263, ¶ 29, 296 Mont. 402, ¶ 29, 989 P.2d 800, ¶ 29 (quoting *Miller v. Titeca* (1981), 192 Mont. 357, 364, 628 P.2d 670, 675). Moreover, "[i]t is always to be presumed that no absurd or unreasonable result was intended by the complainant." *Hidden Hollow Ranch v. Collins* (1965), 146 Mont. 321, 326, 406 P.2d 365, 367-68.

¶61 The subject of the Complaint is not only the Police Department's refusal to disclose the full text of the Reports, but also the Department's lack of systematic procedures in responding to the Newspaper's requests. The spirit of the allegations is that the Police Department's shortcomings in this regard hinder the public's exercise of

---

[1] As the Court notes, the Newspaper fails to present any appellate argument as to its claim regarding the cost of obtaining copies of public documents. Notwithstanding the deficiency in the Newspaper's appellate brief, this claim deserved to be litigated. After all, why should a government agency be allowed to profit from a citizen's exercise of his or her constitutional right to know? And what possible justification could there be for allowing an agency to potentially restrict access to public information by way of excessive copy fees?

its right to know.  Viewing the Newspaper's Complaint as a whole, its purpose is clear—it seeks remedial implementation of a policy to facilitate the public's exercise of its right to know in a systematic, consistent, and expedient manner.

¶62    It is equally clear that the Complaint is not without its shortcomings. The Newspaper's request that "complete copies of all initial incident reports" be available on demand, standing alone, obviously conflicts with the exception contained in Article II, Section 9—i.e., that the public may properly be denied access to government documents when "the demand of individual privacy clearly exceeds the merits of public disclosure." Reading this portion of the Complaint in isolation, as the Court apparently does here, one might conclude that the Newspaper advocates a policy which ignores the constitutional exception for individual privacy.  Of course, as the Court notes, "a requirement that governmental agencies provide unredacted copies on demand is untenable."  Yet, the Newspaper also explicitly acknowledged the exception for individual privacy earlier in the Complaint.  Given this acknowledgment, and given that we do not assume a party intends absurd or unreasonable results by a complaint, *Hidden Hollow Ranch*, 146 Mont. at 326, 406 P.2d at 367-68, it is fair to characterize the Newspaper's Complaint, in its totality, as a request for the implementation of a policy in conformity with Article II, Section 9, of the Montana Constitution.

¶63 The Court characterizes this interpretation as a "creative endeavor" which produces a "strained reformation" of the Newspaper's Complaint.[2] In reality, this interpretation merely conforms to long-standing precedent. The law mandates that we not construe Complaints strictly, as if interpreting a plainly worded statute. *See School Trust*, ¶ 29. Rather, as noted above, it is well established that we look to "'the reason and spirit of the allegations in ascertaining its real purpose.'" *School Trust*, ¶ 29. In doing so, we are to honor the purpose evident in the pleadings. *School Trust*, ¶ 29. Accordingly, my interpretation of the Complaint is not a "strained reformation," as the majority asserts; rather, it merely honors the purpose made evident by the pleadings. In my view, the Court ignores the longstanding rule which requires broad interpretation of complaints.

¶64 Additionally, the Court states, without citing authority, that "[t]he mere absence of a policy governing dissemination of documents does not ripen into a violation of the constitutional right to know unless and until an identifiable person is actually denied access to a particular document . . . ." Here, the Newspaper *was* denied access to a particular document. Consequently, it filed suit to obtain the documents and press for the implementation of a policy. Yet, the Court concludes that the Newspaper may not pursue its claim for the implementation of a policy because the claim now lacks a "concrete

---

[2] Incidentally, the only "creative endeavor" involved in this appeal is the Court's decision to undertake the assumption that "Havre apparently does have a policy" for handling requests such as the Newspaper made here—i.e., referral to Officer Barthel. Nothing in the record establishes that referrals to Barthel constitute a "policy." Moreover, no legitimate policy can depend on one person for its implementation in a bureaucratic organization. If Barthel is solely responsible for handling these requests, then the public's ability to exercise its right to know is restricted to the hours of Barthel's weekly work schedule, as well as those periods of time when he is not on sick leave, vacation leave, or preoccupied with other pressing matters which require police attention.

37

factual basis." In so concluding, however, the Court fails to explain how this claim has become "wholly divorced" from the Police Department's undisputed violation of the public's right to know. There is simply no basis for concluding that this claim for the implementation of a policy has lost its connection with the Newspaper's underlying claim for disclosure of the unredacted Reports.

¶65 And, if a clear violation of the right to know by a government agency does not entitle the public to challenge the agency's failure to implement a policy, what does? How will a member of the public ever be able to challenge a government agency's failure in this regard if the Court insists that such a claim is a request for "prospective" relief?

¶66 Apparently the Court has concluded that the public may seek disclosure of particular documents, but may not, in cases such as this one, assert a claim for the implementation of a policy. The Court's reasoning effectively precludes the public from ever challenging a government agency's failure to implement a policy as long as the defendant agency discloses the particular information sought prior to adjudication (an act which now apparently removes any "concrete factual basis" from the complaint). I find this approach entirely unjustifiable.

¶67 Finally, I am troubled that the Court so readily disregards the Newspaper's claim for the implementation of a policy, as this request goes straight to the heart of the problem at issue—i.e., the government's proven tendency to disregard the public's right to know, which leads to lawsuits that needlessly consume public funds and judicial resources.

38

¶68    Article II, Section 9, of the Montana Constitution provides that the public's opportunity to examine government documents is a part of the right to know. As this right is contained in the Montana Constitution's Declaration of Rights, it is a fundamental right. *State v. Tapson*, 2001 MT 292, ¶ 15, 307 Mont. 428, ¶ 15, 41 P.3d 305, ¶ 15. In interpreting Section 9, we have held that there is a constitutional presumption that all documents of every kind in the hands of public officials are amenable to inspection. *Great Falls Tribune v. Mont. Public Service Comm'n*, 2003 MT 359, ¶ 54, 319 Mont. 38, ¶ 54, 82 P.3d 876, ¶ 54. Additionally, we have held that this right to examine government documents, together with the public's right of participation as provided for in Section 8 of Article II,[3] imposes "an 'affirmative' duty on government officials to make all of their records and proceedings available to public scrutiny." *Great Falls Tribune*, ¶ 54.

¶69    The Court suggests that the presumption of openness may be limited to cases involving "the rights of corporate entities" because *Great Falls Tribune* "only involved the rights of corporate entities, rather than the rights of private individuals." However, we have never limited the presumption in this way and it is truly frightening that we would do so here by way of dictum. Our articulation of the presumption in *Great Falls Tribune* was an unqualified holding regarding the constitutional right to know; not merely a holding limited to the particular facts of that case. *See Great Falls Tribune*, ¶ 54.

---

[3]    Article II, Section 8 provides: "**Right of participation.** The public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to the final decision as may be provided by law."

Moreover, this holding is little more than a restatement of Article II, Section 9, which provides that "[n]o person shall be deprived of the right to examine documents . . . *except* in cases in which the demand of individual privacy *clearly* exceeds the merits of public disclosure." (Emphasis added.) This plain and unambiguous language means that when the balance is even, the right to know trumps, thus requiring disclosure. In fact, even if the balance is slightly in favor of individual privacy, the right to know still trumps, thus requiring disclosure. It is *only* when the balance is *clearly* in favor of individual privacy that the documents may be properly withheld from the public. It is at this stage, and this stage only, that the right to individual privacy trumps the right to know.

¶70 Thus, the plain language of the Constitution requires that disclosure is the rule, and withholding public documents based on individual privacy is the exception. The term "except" in Section 9 necessarily makes withholding information based on privacy the *exception* under elemental rules of statutory interpretation. Thus, the right to know is superior in that it presumptively trumps the right to individual privacy in the context of right-to-know cases. And, if this plain language were not clear enough, the transcripts of the Constitutional Convention make it unquestionable. As the venerable Delegate Dorothy Eck stated, with regard to Section 9, "we added the word 'clearly' with the intention of *tipping the balance* in the favor of the right to know." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1670 (emphasis added).

40

¶71 Simply put, the presumption of openness, which we formally recognized in *Great Falls Tribune*, is contained in the plain language of Section 9. It does not depend in any way on the particular facts of *Great Falls Tribune*, nor is it qualified thereby. The Court's suggestion to the contrary blatantly disregards the plain language of Section 9.

¶72 The Court goes on to observe that the presumption of openness and the government's affirmative duty of disclosure "cannot be read to nullify the need, in the first instance, to balance the right to know against the conflicting right of individual privacy on an ad hoc basis when both rights are at issue." Of course, the plain language of Article II, Section 9, mandates this conclusion. However, in balancing these two rights, as noted above, the presumption of openness is the guiding principle and it is not overcome unless the right of individual privacy *clearly* exceeds the merits of public disclosure.

¶73 Despite the clear language of Section 9 which discloses the presumption of openness, and despite the government's affirmative duty of disclosure as articulated by this Court, government agencies have repeatedly demonstrated a disregard and misunderstanding of the public's right to know. We see it in this case, in the cases we have considered over the years, and in a recent study which Professor Fritz Snyder recounts as follows:

> In 2003, a survey in Montana showed an 81 percent success rate in obtaining public information from public agencies. However, nearly half of Montana's county sheriffs violated the state's Open Records Law by refusing to release their jail rosters. The sheriffs or their employees claimed the inmate lists were confidential. The Daniels County sheriff said he did not care what the law said: "He wasn't about to let anyone see his

41

list of recent crime calls without a court order." "A District Court clerk in Chinook took it upon herself to censor the roster of court cases by removing ones 'the public doesn't need to know about.'" In six counties, officials said it would take a court order to get the information. "In all, just 11 counties provided the reports at the first request from the citizens making the checks." Judith Basin County Sheriff Robert Jacobi said that his office "has a responsibility not to disclose the misfortunes of people in the community to anyone who walks in off the street."

Fritz Snyder, *The Right to Participate and the Right to Know in Montana,* 66 Mont. L. Rev. 297, 317-18 (Summer 2005) (citing, *inter alia*, Bob Anez, *Records Audit Reveals Barriers*, MISSOULIAN, Oct. 22, 2003, at A1. Among the items requested was a copy of each sheriff's report of the incident calls handled in the previous twenty-four hours.).[4]

¶74    Given the government's—especially law enforcement's—track record, it is no wonder that the Newspaper seeks the implementation of a policy.[5] Because the right to know is a fundamental right, it is indeed necessary that government agencies implement policies to effectuate the public's ability to exercise this right on a consistent basis and in an expedient fashion. Otherwise, the presumption of openness will be constrained by the whims of bureaucrats who may or may not fully understand or wish to concede the public's fundamental right to know. Of course, privacy interests must be considered in light of the unique facts attendant to the various scenarios which will arise. Thus, no

---

[4]    Further study of the Freedom of Information Act survey to which Professor Snyder refers can be made at the Montana Associated Press website: http://www.ap.org/montana/MTFOI.html (last visited August 15, 2006). *See also* http://foi.missouri.edu/openrecseries/mt/countycompliance.html (last visited August 15, 2006).

[5]    The Court asserts that I am relying on facts outside the record. Of course, my opinion here, both in concurrence and dissent, is based solely on the facts of record and the relevant law. Although I have referenced facts outside the record, I most certainly do not "rely" on these facts in forming my opinion. Plainly, my reference to the Freedom of Information Act survey is only an observation regarding the context in which this cases arises; not a factual basis on which I rest my opinion.

policy could serve as a substitute for the necessary ad hoc determinations to be made by government agencies in the first instance. However, a policy would help to facilitate the public's right to know by at least providing a systematic process for making each ad hoc determination.

¶75    For example, a policy could specify who would make the disclosure determination and how it would be made; it could specify a definite timeline for this determination;[6] and it could provide for an explanation to be given to the public when information is withheld. Additionally, a policy could set guidelines for the redaction of information which is generally protected by the right of individual privacy. Further, a policy could also serve to educate those in the agency as to the presumption of openness and the government's affirmative duty of disclosure. In this way, a formal policy could reduce the number of lawsuits instituted to obtain public information. Consequently, if fewer lawsuits occur, fewer public funds will be spent on litigation and awards of attorney fees to those who must vindicate their right to know through a lawsuit. Indeed, the instant dispute may have been averted if the Police Department had been operating pursuant to a policy which honored the public's right to know.

¶76    Conversely, with no policy in place, government agencies will inevitably continue to fail in their affirmative duty to make their records publicly available. We will continue to see abuses such as that perpetrated in this case—i.e., withholding public information for well over two months, thus forcing the Newspaper to file suit, and then turning over

---

[6]    The right to know means little if public officials are allowed to withhold public information for indefinite periods of time or until current news becomes stale news.

the information before an adjudication on the merits. As a result, the public will continue to pick up the tab for needless lawsuits instituted to obtain undisputedly public information.

¶77  The Newspaper's effort to remedy this situation finds support in another constitutional context; the United States Supreme Court has indicated that the government may not delegate unbridled discretion to bureaucrats whose official decisions may impinge on the free speech guarantee of the First Amendment. In *Forsyth County, Ga. v. Nationalist Movement* (1992), 505 U.S. 123, 124, 112 S.Ct. 2395, 2398, 120 L.Ed.2d 101, the United States Supreme Court considered an assembly and parade ordinance which allowed the government administrator to vary the licensing fee for assembling or parading to reflect the estimated cost of maintaining public order. While some prior restraints on speech are constitutionally acceptable, the Supreme Court stated, a regulation of this type may not delegate overly broad licensing discretion. *Forsyth County*, 505 U.S. at 130, 112 S.Ct. at 2401 (citations omitted). In fact, the decision observes, a governmental regulation of this type which can be arbitrarily applied is *inherently inconsistent* with a valid restriction on the freedom of speech. *Forsyth County*, 505 U.S. at 130, 112 S.Ct. at 2401 (citation omitted).

¶78  The ordinance at issue contained no articulated standards, it did not require the administrator to rely on any objective factors, and it did not obligate the administrator to provide an explanation for the decision rendered. *Forsyth County*, 505 U.S. at 133, 112 S.Ct. at 2403. Having observed these facts, and having noted that "[t]he decision how

44

much to charge . . . is left to the whim of the administrator," the Supreme Court held: "The First Amendment prohibits the vesting of such unbridled discretion in a government official." *Forsyth County*, 505 U.S. at 133, 112 S.Ct. at 2403.

¶79 I believe the same principle holds true here in the context of the fundamental right to know. While the ordinance at issue in *Forsyth County* granted overly broad discretion to the administrator, Havre's lack of a formal policy in this case effectively grants *boundless* discretion to the Police Department in its decisions regarding the public's right to know. This unbridled discretion is inherently inconsistent with the presumption of openness, as it conditions the public's timely exercise of a fundamental right on the whims of whomever may be available to disseminate public information from the Police Department at a given time.

¶80 While openness is critical in any Montana government agency, it is particularly critical in law enforcement agencies because of the enormous power they wield. Our law enforcement agencies serve the public in a conscientious and honorable manner, but they are nonetheless bound by the same constitutional principles as other government actors and, specifically, to an affirmative duty to make their records available to public scrutiny. As we have stated,

> the delegates to the Constitutional Convention made a clear and unequivocal decision that government operates most effectively, most reliably, and is most accountable when it is subject to public scrutiny. . . .
> While on any given occasion there may be legitimate arguments for handling government operations privately, the delegates to our Constitutional Convention concluded that in the long-term those fleeting considerations are outweighed by the dangers of a government beyond public scrutiny.

45

*Great Falls Tribune v. Day*, 1998 MT 133, ¶¶ 34-35, 289 Mont. 155, ¶¶ 34-35, 959 P.2d 508, ¶¶ 34-35.

¶81     The Court of Appeals for the Sixth Circuit has stated:

> When government begins closing doors, it selectively controls information rightfully belonging to the people. Selective information is misinformation. The Framers of the First Amendment "did not trust any government to separate the true from the false for us." *Kleindienst v. Mandel*, 408 U.S. 753, 773, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (quoting *Thomas v. Collins*, 323 U.S. 516, 545, 65 S.Ct. 315, 89 L.Ed. 430 (Jackson, J., concurring)). They protected the people against secret government.

*Detroit Free Press v. Ashcroft* (6th Cir. 2002), 303 F.3d 681, 683. Although these statements were made with regard to the United States Constitution, they are nonetheless applicable here. On a similar note, J. Robert Oppenheimer, the father of the atomic bomb, has observed a principle that underlies Montana's right to know:

> We do not believe any group of men adequate enough or wise enough to operate without scrutiny or without criticism. We know that the only way to avoid error is to detect it, that the only way to detect it is to be free to inquire. We know that in secrecy error undetected will flourish and subvert.

¶82     The right-to-know guarantees of our Constitution, Article II, Section 9, are among the most important fundamental guarantees that Montanans enjoy. As we have recognized, quoting the Bill of Rights Committee, Section 9 arises

> out of the increasing concern of citizens and commentators alike that government's sheer bigness threatens the effective exercise of citizenship. The committee notes this concern and believes that one step which can be taken to change this situation is to Constitutionally presume the openness of government documents and operations.

46

*Bryan v. District*, 2002 MT 264, ¶ 31, 312 Mont. 257, ¶ 31, 60 P.3d 381, ¶ 31 (quoting

the 1972 Montana Constitutional Convention, Vol. II at 631).

¶83     In recognition of the vital importance of the public's right to know, and given the

premature resolution of the Newspaper's claim for the implementation of a policy, I

would reverse and remand with instructions that Havre must answer the Newspaper's

Complaint to further the development of the factual record in this case.  Because this

Court orders dismissal without prejudice, the Newspaper will be forced to re-file its

Complaint before proceeding with its claim for the implementation of a policy.[7]

¶84     The Constitution has been the supreme law of this State for more than thirty years.

It is wholly unacceptable that the media and public are still met with intransigence,

stalling tactics, and delay, and are ultimately forced to litigate to obtain public documents

to which they are constitutionally entitled.  We see far too many of these cases each

year—and there are more waiting in the wings as we hand down this Opinion.  Simply

put, the Newspaper should not have been forced to sue in order to exercise the

constitutional right to know.  And, when the Newspaper is forced to sue, it should be

entitled to attorney fees.  Indeed, we should recognize by now that governmental

disregard for the public's right to know will continue *ad infinitum* unless the custodians

---

[7]   The Court's formal resolution of this case is needlessly ambiguous.  The Court correctly frames Issue Two as a question of whether the District Court erred in granting summary judgment.  However, the Opinion does not expressly answer this question.  Rather, it only *implies* that an error was committed.  Similarly, the Court does not formally reverse the District Court's Order.  Of course, reversal is the only basis for the remand in this case.  Yet, the Court declines to employ the precision which has traditionally defined our opinions, choosing instead to place today's Opinion in a nebulous category of resolution wherein remand is proper without a reversal, pursuant to an implied conclusion that some error has been committed.  No legal precedent provides support for this approach.

of public documents appreciate that violations of the right-to-know provisions of the Constitution will, in the usual course, result in an award of attorney fees in favor of the requestor and against the local government.

¶85 A closed government is an evil government: it abuses trust, it perverts truth, it misappropriates faith, and, in the end, it reviles the petitions of its citizens to know how they are governed and by what manner of people. Our right to know is too fundamental to be entrusted to the whims of those who neither understand its constitutional birthright nor honor its power to breach the wall of secrecy that divides the government from the governed.

¶86 I dissent.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins in the concurring and dissenting Opinion of Justice Nelson.

/S/ PATRICIA COTTER